UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CARRIER VIBRATING EQUIPMENT, INC.                                                    PLAINTIFF

v.                                                                    CIVIL ACTION NO. 3:07-CV-521-S

ANDRITZ SEPARATION, INC. and
MARCUS HAUPTMANN                                                                    DEFENDANTS

## MEMORANDUM OPINION

This matter is before the Court on cross-motions for summary judgment. The crux of the case is a non-competition agreement signed by Marcus Hauptmann when he was employed by Carrier Vibrating Equipment. Carrier claims Hauptmann violated the agreement; Hauptmann says he did not. For the reasons that follow, the Court agrees with defense and will grant its motion for summary judgment.

## BACKGROUND

Marcus Hauptmann, a German citizen, worked as an engineer and project manager for Carrier from October 2003 until January 2006. Carrier is a Kentucky corporation that designs, manufactures, and sells commercial equipment for use in manufacturing and processing plants. One of Carrier's products is a fluid bed dryer, which is a large piece of industrial equipment used to separate or evaporate water after a chemical process is completed. A fluid bed dryer can be either stationary or vibrating.

As a Carrier employee, Hauptmann had access to certain proprietary information regarding the manufacture of equipment like fluid bed dryers. Consequently, Carrier insisted in January 2005 that he sign a non-competition agreement as a condition of his continued employment. This agreement read, in pertinent part:

> For a period of two (2) years following the date of Employee's termination of employment with Carrier, Employee will not within the United States of America or within any nation in which Carrier has had substantial sales during the five-year period immediately preceding Employee's termination
> I) Directly or indirectly enter into the employ of, or render any services to, or act in concert with, any person, partnership, corporation, direct competitors as listed on the attached sheet entitled "Direct Competitors" or other entity engaged in the business of manufacturing, selling or distributing industrial vibrating equipment of the type manufactured or under development by Carrier on the date of the Employee's termination of employment with Carrier; or
> . . .
> III) Become interested in any such direct competitor as listed on the attached sheet, "Direct Competitors" or service, directly or indirectly, as an individual, partner, shareholder, director, officer, principal agent, employee, consultant or in any other relationship or capacity.

Defendant Andritz Separation does not manufacture or sell vibrating equipment, nor is it listed on the "Direct Competitors" attachment. The list does, however, name "Sulzer Chemtech/Vatech" of Houston, Texas[1] as a direct competitor. This is relevant because Andritz had acquired some portion of VA Tech's assets in November 2004 (two months before Hauptmann and Carrier signed the non-competition agreement). Andritz claims it bought only a portion of VA Tech's business—its stationary fluid bed technology—as a compliment to Andritz's existing business. Carrier claims that Andritz acquired VA Tech *in toto*, such that Andritz was effectively included in the list because it assumed VA Tech's identity.

After leaving Carrier's employ, Hauptmann signed on with Andritz in April 2006. Andritz hired him in part so that it could acquire the expertise in fluid bed technology that he had developed during his earlier work for VA Tech in Germany.

---

[1] This entry on the list apparently refers to Voest Alpine, a company for which Hauptmann had previously worked in Germany. It is also known as "VA Tech" and "VA Tech Wabag." The Court will refer to it as "VA Tech."

In May 2006, Westlake Chemical Corporation began the process of seeking bids on a new stationary fluid bed dryer for its Calvert City, Kentucky facility. Four companies, including both Andritz and Carrier, submitted bids to the final round of proposals. Westlake had bought Carrier products in the past, and Carrier was initially told that it had won the project during a July 18, 2007 meeting. Thereafter, Hauptmann began contacting Westlake directly, offering criticisms of Carrier's products and touting Andritz's offering. Following Hauptmann's sales pitch, Westlake ultimately awarded the project to Andritz at a price of $6 million.

After losing the Westlake project, Carrier brought suit against Hauptmann and Andritz, stating three causes of action. Count I asserts that Hauptmann breached his non-competition agreement by going to work for Andritz before its expiration. Count II seeks to hold Andritz partly responsbible for this alleged breach, on the theory that it tortiously interfered with Carrier's contract with Hauptmann. Count III alleges that both defendants are liable for interfering with Carrier's relationship with Westlake by soliciting Westlake in violation of Hauptmann's agreement with Carrier and through the use of Hauptmann's knowledge of Carrier's products and processes. Each side has moved for summary judgment: the defendants in full, and Carrier as to liability on Counts I and II. (Carrier concedes that it is not yet entitled to judgment as to causation and damages on Counts I and II, or as to the entirety of Count III.)

## DISCUSSION

A party moving for summary judgment has the burden of showing that there are no genuine issues of material fact and that the movant is therefore entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Not every factual dispute between

the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986). The dispute must also be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* The disputed issue need not be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). The evidence must be construed in the light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

Sitting in diversity, the Court will apply Kentucky law to resolve the questions at hand. *Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 573 (6th Cir. 2008) *(citing Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)).

**A.**

This case hinges on the question whether Hauptmann breached his non-competition agreement with Carrier. If not, Count I obviously fails, as does Count II. (Andritz cannot be responsible for tortious interference with contract if the contract in question was not breached.) And if Hauptmann had no contractual duty not to help his new employer seek the Westlake deal, it is hard to see a ground on which either defendant can be held responsible for Carrier losing the bid. We therefore address the effect of the non-competition contract.

As an initial matter, the agreement is enforceable as written. The basic policy in Kentucky is to enforce non-competition agreements "unless very serious inequities would result." *Hall v.*

*Willard & Woolsey, P. S. C.*, 471 S.W.2d 316, 318 (Ky. 1971). A contract in restraint of trade is valid if "reasonable in scope and purpose." *Id.* at 317. "The test of reasonableness is whether the restraint, considering the particular situation and circumstances, is such only as to afford a fair protection to the legitimate interests of the party in favor of whom it is given and not so extensive as to interfere with the interests of the public." *Stiles v. Reda*, 228 S.W.2d 455, 456 (Ky. 1950) (*quoting Johnson v. Stumbo*, 126 S.W.2d 165, 169 (Ky. 1938)). *See also Central Adjustment Bureau, Inc. v. Ingram Associates, Inc.*, 622 S.W.2d 681, 685 (Ky. Ct. App. 1981). The contract in this case was limited in duration to two years, and in geographic scope to those countries where Carrier does substantial business. Further, its restrictions were limited only to other manufacturers of vibrating equipment and to those companies listed as direct competitors. Taken as a whole, these restrictions were a reasonable means for Carrier to protect itself.

The next question is whether Hauptmann violated this agreement by going to work for Andritz within the two-year restriction period. It is not apparently disputed that Andritz does not manufacture or distribute "industrial vibrating equipment of the type manufactured or under development by Carrier." Nor is Andritz listed as a Direct Competitor on the separate sheet attached to the agreement. In defendants' view, this closes the case. Plaintiffs argue, however, that because VA Tech *is* on the list, and because Andritz had purchased certain of its assets, VA Tech and Andritz were functionally the same entity—thus precluding Hauptmann from working there.

The defendants hold the better view. The terms of the contract and addendum are plain enough, specifically mentioning several companies (including "Sulzer Chemtech/Vatech") and omitting Andritz. Citing evidence and testimony external to the contract, Plaintiffs retort that "regardless of the precision of Carrier's list, both Carrier and Hauptmann knew and understood this

-5-

reference to 'Vatech'" as including Andritz as VA Tech's purchaser. (Pl.'s Resp. to Def.'s Mot. for Summ. J. 7.) This argument is foreclosed by the parol evidence rule.

> The parol evidence rule is one of substantive law. It defines the limits of a contract. Where the parties put their engagement in writing all prior negotiations and agreements are merged in the instrument, and each is bound by its terms unless his signature is obtained by fraud or the contract be reformed on the ground of fraud or mutual mistake, or the contract is illegal.

*Childers & Venters, Inc. v. Sowards*, 460 S.W.2d 343, 345 (Ky. 1970) (citations and internal quotation marks omitted). None of the exceptions to this rule are present here, and the parties are properly bound by the terms of the agreement. Carrier claims that Andritz's purchase of some VA Tech assets constituted no more than a name change for the latter company, but Andritz, VA Tech Wabag, and Sulzer Chemtech were distinct companies at the time and remain distinct to this day. Andritz had completed its purchase of VA Tech assets (whatever the scope of that purchase) by the time Carrier and Hauptmann signed their agreement. The evidence shows that Carrier was aware of this sale by late 2005, but did not amend the list of "direct competitors" as its contract with Hauptmann permitted. Carrier had every opportunity both before the contract was signed and during Hauptmann's employment to revise the agreement to preclude his employment with Andritz. Having failed to do so, Carrier cannot subsequently be heard to argue that "Sulzer Chemtech/Vatech" means "Andritz Separation, Inc." An agreement not to compete with one's former company in certain specified ways cannot be read as a general prohibition on potentially damaging activities not enumerated in the agreement. Because the plain terms of the non-competition agreement do not prohibit Hauptmann from working at Andritz—it neither deals in vibrating equipment nor is present on the Direct Competitors list—he did not breach the agreement by taking the job. Consequently, the Court will grant summary judgment for the defendants on Counts I and II of the Complaint.

**B.**

The remaining issue is Carrier's claim for tortious interference with its prospective business relationship with Westlake. To recover, Carrier must prove six elements: (1) the existence of a valid business relationship or its expectancy; (2) a defendant's knowledge thereof, (3) an intentional act of interference; (4) an improper motive; (5) causation; and (6) special damages. *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1080 (W.D. Ky. 1995) (*citing Nat'l Coll. Athletic Ass'n v. Hornung*, 754 S.W.2d 855 (Ky. 1988)). The critical question here is whether Carrier can show an improper motive on the part of either Hauptmann or Andritz. We conclude that it cannot.

In *Hornung*, the Kentucky Supreme Court concluded that improper motive is judged by reference to the seven factors provided in Restatement (Second) of Torts § 767 (1979):

> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f) the proximity or remoteness of the actor's conduct to the interference and
> (g) the relations between the parties.

In addition, the court held: "to prevail a party seeking recovery must show malice or some significantly wrongful conduct." *Hornung*, 754 S.W.2d at 859. The court went on:

> The [interference] cases have turned almost entirely upon the defendant's motive or purpose, and the means by which he has sought to accomplish it . . . .
> Some element of ill will is seldom absent from intentional interference; and if the defendant has a legitimate interest to protect, the addition of a spite motive usually is not regarded as sufficient to result in liability.

*Id.* (*quoting* Prosser and Keeton on Torts § 130 (W. P. Keeton ed. 5th ed. 1984)). Importantly, however, "malice may be inferred in an interference action by proof of lack of justification." *Id.* (*citing Smith Dev. Corp. v. Bilow Enters., Inc.*, 308 A.2d 477 (R.I. 1973); Restatement (Second) of

-7-

Torts § 766 Comment S (1979) ("The context and the course of the decisions make it clear that what is meant is not malice in the sense of ill will but merely 'intentional interference without justification.'").

Carrier points to two facts as establishing an improper motive. The first is that the defendants "openly conducted their business in violation of Hauptmann's non-competition obligations." (Pl.'s Resp. to Def.'s Mot. for Summ. J. 30.) But because (as the Court has held) Hauptmann did not violate his obligations, this claim does not support plaintiff's position. Second, plaintiffs claim that "Hauptmann used his inside knowledge and former position at Carrier to compete unfairly with Carrier on the Westlake bid." (*Id.* at 30-31.) But it is hard to see just what was unfair about Hauptmann's or Andritz's actions. Hauptmann was not contractually or otherwise barred from working where he did, and he can reasonably be expected to use whatever knowledge he had about his competitors in formulating a competing bid. To be sure, Carrier could have written the non-competition agreement to protect itself against what Hauptmann did when he went to Andritz, but it failed to do so. Carrier does not claim any violation of its rights to intellectual property or trade secrets, nor does it explain how Hauptmann's use of his knowledge demonstrates a "wrongful, malicious, and unlawful purpose of causing damage or loss to Carrier without right or justification," as alleged by the Complaint. (¶ 34.) In short, plaintiff has not provided sufficient evidence to establish that Hauptmann or Andritz acted with an improper motive in submitting a competing bid—even if part of that submission was a criticism of the merits of Carrier's bid. So far as the Court can tell, Andritz's motive was for its product to succeed. The fact that this success would necessarily entail Carrier's failure (the bidding process was, after all, a zero-sum game) does not show

impropriety on the part of the defendants. Absent this element, Carrier's claim cannot prevail. Summary judgment for the defense is warranted

\* \* \*

For the reasons stated herein, defendants are entitled to summary judgment. The Court will enter a separate order consistent with this opinion.

**Charles R. Simpson III, Judge**
**United States District Court**